at all. Mr. Taylor and Mr. Agaropoulos. Here you are. Thanks. Whenever you're ready, Mr. Taylor. Good afternoon, your honors. I'd like to reserve four minutes for rebuttal time, please. That's fine. You better announce your name just for the record. Lindsey Taylor from Corolla Burn on behalf of Hanover3201Realty. Thank you. This appeal involves antitrust standing for a party who is not a competitor or customer in the relative market. Have you alleged that the value of your land, of 3201's land, has diminished since Village started its actions against you or against the attempt to stop the Wegmans from coming in to this particular location? I think that's among the damages that we have alleged that have been. You've alleged that the value of your land has diminished. Is that correct? Because of the delay in the approval process, but that's not the primary damage that we are alleging. There's a nursery just being harmed in antitrust injury. Correct. How have you as a landlord suffered antitrust injury? We've had to pay for the defense of the various challenges to the approvals for the property. There's been a delay in construction. As a result of the delays in construction, Hanover has had to continue to pay taxes on the property and has been a delay in receiving rent because the building has not been able to... The Wegmans is not undergoing, I mean it's not constructing a supermarket there. Correct, they're going to be building a supermarket. They're going to be? Yes. They still have an intent to follow through on that? Yes. You say construction, but have they started construction? No, because Village keeps challenging all the various approvals. They have a two-year period where they can back out. They haven't backed out a period. Correct. The second part of the definition of who has antitrust standing is those whose injuries are the means by which the defendants seek to achieve their anti-competitive ends. You're basically a supplier, aren't you? You're in the position of a supplier? No. You're not a customer? You're not a competitor? One of our other arguments is that we are a competitor in the... We're a competitor with the captive landlord for Village's shop right of greater Morristown in the supermarket shopping center market as opposed to the supermarket market, if you understand my distinction there. But what Village is really trying to do is they're trying to keep Wegmans out of the supermarket market by preventing the landlord from getting the approvals necessary to build the building that will house the supermarket. And all of the anti-competitive activities which are intended to keep Wegmans out of the market are directed at 3201 Realty. That falls exactly within the definition that this court and the Supreme Court has enunciated the standard for antitrust standing. Your argument is that you're inextricably intertwined with a major competitor of a shop right? Correct. Inextricably intertwined is a shorthand for the second half of the definition, those whose injuries are the means by which the defendants seek to achieve their anti-competitive ends. And so what cases are you relying on? At the farm, McCready v. Blue Cross Blue Shield. Let's just start with McCready. McCready was an 82 decision of the Supreme Court in which there was an alleged antitrust violation between Blue Cross and psychiatrists in order to harm psychologists. And McCready was what, a patient? Yes, she was a patient who wanted to go to a psychologist and basically Blue Cross would cover psychiatrists but not a psychologist. And so the court said that there's an inextricable intertwining that hurt a consumer. And antitrust normally provisions are out there to protect the marketplace. Correct. So are you a consumer? They're not a consumer, no. But Justice Brennan in that case also made the analogy that if the psychiatrist boycotted a bank because in order to prevent the bank from giving loans to psychologists, then that bank would certainly have an antitrust claim because it is the instrumentality by which the psychiatrists are trying to keep the psychologists out of the market. In other words, if they can get to you, they can keep Wegman out. Right. We're the plug in the... But in fact you were in a sense working on behalf of Wegman, weren't you? Part of the lease, yes. Well, I thought that you were getting all of these permits and making all these applications so that Wegman can build a supermarket on your property. Correct. Under the lease, it's our responsibility to get all of the necessary permits so that they can build the store that they want to build. And so long as those permits don't issue or are tied up, Wegmans can't build. And even to this day, Village is pursuing their old challenges. They're filing new challenges. And so long as these challenges to the approvals are in play, then Wegmans is out of the market and Village maintains its monopoly. Why don't they have North Pennington immunity? Why don't they? Yes. For two reasons, Your Honor. First of all, none of their challenges are meritorious, and they are objectively baseless in the sense that they are not reasonably designed. Well, they prevail on some of those, don't they? Or at least they got – let's take the wetlands permit application. Sure. 3201 was directed to conduct a survey. A BAT survey. Yes, the Indiana BAT survey. Right. And the objection before the Department of Transportation, the direction back was to consider building a reverse jug handle and to renegotiate your obligations to DOT. Gee, that sounds like the supervising authority thinks there's an issue here and you need to go back to the drawing boards. Well, that may be, but the DOT permit was ultimately granted just a few months ago, so you can't say that they were successful. What do you mean the DOT was granted? What was granted? The DOT permit. Oh, the permit. So you can proceed with the plan as originally devised? Not as originally devised, but they now have a DOT permit that would allow ingressing in. But did that require modifications from the original plans? Yes. But wasn't that as a result of the applications that were made? Original to the DOT? I mean, it was a result of applications that were made by Village. Objections by Village. Objections, yes. I mean, was a reverse jug handle added into the modifications? That was not something that came from Village. That came from the DOT itself. But the point is that it can't be entirely baseless. The applications can't be baseless if they manage to cause a change in the plans. Well, I mean, the objections that they did make were baseless. The changes that were made came from the DOT, not from Village, and ultimately the permit was granted so that we can proceed with the development except for the fact that Village filed a lawsuit in Morris County last week saying that the approval that was granted does not conform with the zoning variance that was originally granted. We're talking about four proceedings, aren't we? We've got the flood hazard, the wetlands, the DOT, and the prerogative RITs. Correct. That was what existed as of the date of the complaint. And there's been other since then, you're saying? Yes, and there's also an appeal to the appellate division by an employee of Village for the granting of the wetlands permit. You know, when I read this suit, I'm not unfamiliar with New Jersey, and I thought to myself, it's like a whole new approach to dealing with people who are opposing development. What we'll do is we'll sue them on antitrust grounds. And frankly, in my experience, which is pretty long by now, I never saw litigation quite like this. Just over the development of a property became an antitrust suit. Is this common? The antitrust suit or this type of? Oh, no. What the defendants did is common. I understand that. Oh, that's standard operating procedure. Yeah. But is the response of an antitrust suit a new approach to it? I just don't remember ever seeing one. Well, I mean, part of the issue, Your Honor, is that this court has only, even though it has the two-part standard, consumers or competitors in the marketplace and those whose injuries are the means by which the defendant are meant to achieve their ends, the court has never addressed or come across an issue where standing has been granted to anybody that falls within the second part of the definition. Well, the question. I mean, how common are these kind of suits in response to the standard operating procedure that some have of attempting to stop development? I couldn't tell you, Your Honor. I just don't know. I thought this. What the defendants did here, and there's no question. Look, they're not operating here in the public interest. It's business, and they don't want the competitor. I can understand that, and that's good or bad, but that's the reality. Okay. But what they've done here is that they have exhausted procedures that were set up for people to follow with some success. I mean, there has been some success, I think. So where do you draw the line? I say, well, it's a sham. Well, how do you decide it's a sham, the North Pennington defense? Why is it a sham? There was a basis for a lot of their complaints. Now, most people, look, they wouldn't have done it. I understand it. They weren't acting in the public interest. I'll at least assume that. But why is it a sham, though? Well, that brings me, I believe, Your Honor, to another North Pennington test, which involves when there is a series of lawsuits or legal actions, challenges, whatever, that was enunciated by USS Posco from the Ninth Circuit following California motor transport, where you've got a series of actions by a defendant. Even though by chance one or two things might be successful, if it's part of a plan by the defendant to file challenges regardless of their merits in order to make the plaintiff go through the process of dealing with the challenges, then that's another sham exception to North Pennington. But I think Judge Greenberg's question is, look, you're writing an opinion here. When is something that's done a sham when, in a couple of cases, for example, here, you're asked, one, with the Department of Transportation, you're asked to go back to the drawing board and negotiate something else. So when do you consider you've crossed the line? I think you really have to look at, was it a procedural victory? For lack of a better term, a victory. What's the end result, really? You can have a lawsuit. Did the village achieve any victories in its war proceedings? Not as far as we're concerned, no. Well, other than stopping the development? Correct. That's the whole purpose. All right. We'll hear from Mr. Argyropoulos then. Get you back to the panel. May it please the Court, Anthony Argyropoulos of Epstein Becker Green for the defendants, Village Supermarkets. Judge Greenberg asked an interesting question. Why is it a sham? And I was thinking when he asked the question, well, it's a sham because you really don't care about Indiana vets. You just want to keep Wegman out of competing or make sure they don't compete with the shop right. Well, the Village Supermarkets is exercising rights that it has to object to a development. Now, as Judge Greenberg pointed out. Go ahead. You finish and then I'll pick up on it. Well, yeah, you say exercising its rights, but it also can be a sham in exercising your rights if your true motive is not because you care about the wetlands, not because you care about a particular permit, but rather you just want to keep them out so that Village Shop Right can have sort of corner of the market. You want to keep the competitor out. Under North Pennington, you have a two-part test, as the panel is well aware. The first part of the test is, well, is there a probable cause? Is there an objective? Well, subjectively intend to interfere, and then is it objectively baseless? Correct. And so the issue here is two-part. One, is there a probable cause to bring an objection? And that answer in this case is yes because there has been success as to some of these objections. And these aren't a series of litigations. These are basically part and parcel of one objection to one project. It seems as if at every opportunity to object to anything with regard to this development, there is an objection put up. I mean, we've got four before us, and we're told that there's others after it. You're not really contending that you're not subjectively intending to interfere. I didn't see that in the briefs. So then we really get down to whether it's objectively baseless. And we were talking with Mr. Lindsay that, well, maybe the DOT objection, which led to some revisions in the traffic plan, may make that particular one not objectively baseless. But you've got, for example, the first two, or the one, the flood hazard. I mean, that was dismissed basically as meritless. The prerogative rinse was dismissed as basically meritless. Wetlands, somebody says, hey, there might be Indiana bats. Why don't you just go find out if there are Indiana bats. That's conceivably baseless. Well, I don't think that, certainly working backwards, it's not conceivably baseless to raise to a regulatory agency that there are issues in the manner in which this is proceeding. You should look into them before you allow the project to proceed. The DEP determined that there was a basis to conduct the study to determine whether there is an endangered species at the site. But you didn't really care about Indiana bats, did you? No, I mean, that was not a concern to shop-right supermarkets. And, of course, the study ended up concluding that there were no Indiana bats. But on the other hand, the left-hand turn objection was upheld and a reverse jug handle was installed. And on the other hand, the notice provisions that Village objected to were upheld and the Wegmans Project had to re-notice. So if you had, let's just pick them theoretically, you have ten objections and one of them causes some modification to a traffic pattern. Can a court, just because one of them requires some modification that you can say categorically that is not a sham? Well, it's the difficulty, I think, that this entire theory of the plaintiff presents for a court is a court now has to get in the weeds and disentangle each of the interjections. Well, the court's in the weeds and they're in the weeds because you're putting them in the weeds, all of us, because you're objecting to a Wegmans, which, if you look at Consumer Reports, Consumer Reports is, you know, so far and away the favorite supermarket in America. I've never been in one, so I can't tell you. But the latest Consumer Reports is, you've seen it, have you not? I have not, no. It's Wegmans and everybody else. I read it. I think Wegmans must have written it. It was a fabulous report. I was stunned when I read the report, actually, from Consumer Reports. So, I mean, you've got something out there that's got a great reputation, and it appears that you've seen, or at least you read about, wherever they go, people attempt to try to stop them because they apparently don't want the competition. So then the question becomes, they're getting defensive and trying to deal with that, at least developers are in this case. But let's assume for the moment, what if Wegmans were to have brought the suit against Village? They would have had standing, wouldn't they? Then perhaps they would have standing. Certainly, our view is, and it's the view of the law, that if you have a party who has a more direct interest in an antitrust injury, that's the party that has standing. And here you don't. One of the questions that the panel was asking was, well, is this the first time this type of thing has happened? And it's not. We're not really breaking new grounds from the defense's perspective. The South Haven case held that a developer's interest in lost rents or the devaluation of its property was insufficient to represent an antitrust injury, and consequently in South Haven, which is a Sixth Circuit case, that appellate court dismissed the case. I ask that this happen before, not from your point of view, but whether a suit like the plaintiff brought, whether this was a new idea or a new way to challenge the challenge. My expectation is that if this panel were to allow this case to proceed on standing grounds, you'd see a lot of these cases. I thought the same thing, that this may open up a whole new field. It does, and it would open up a whole new field to a category of claimants that certainly from our perspective, I think from the perspective of McCree, from the perspective of the cases that we've cited, carpet group out of this circuit would include a whole host of plaintiffs that really aren't included within the congressional intent. But there are specific ways of looking at this. I mean, the Supreme Court has posited two different approaches. One is to determine whether the filings have objective merit, but the other one is to determine whether there's a pattern of baseless repetitive claims. So there are very specific tests that one can adopt. And I would think here, because there are four separate actions that you have filed, I think one of the things that we can look at is whether there's a pattern of baseless repetitive claims designed to keep out a competitor. The plaintiff would have the court adopt the USS Popso case, which speaks about the numerosity of filings and baseless filings. I thought they would rather have California Motor Transport on their side. Well, they're referring to USS Popso, and that analysis deals specifically with the numerosity, the volume of baseless claims. Here, our view is because of the way New Jersey is set up, because of the regulatory framework, if there were one body that could hear these objections, these objections would be filed before that body. The DOT in New Jersey handles transportation objections. The DEP handles environmental objections. Issues concerning municipal board action has to go through an action in lieu of prerogative writ. So from our perspective, although these are objections that are in, let's call them three different fora, they're really all one objection. On that basis alone, the fact that there has been success, certainly on the left-hand turn issue, at minimum. You've had minimal success, but it's hard to think that you are doing this out of the goodness of your heart. You're doing this to keep out a competitor. And no one is suggesting, and there's nothing on the record that suggests, that this was an issue that was born out of the public interest or some altruistic view. In fact, as part of the interest that were laid out directly and openly to the lower court, to the state court, had to do with a competitive impact that would be had, among other things, as a result of the swagments. Would it be true to say that none of the successes that you achieved, however you wish to define them, had anything to do with shop right? Did it benefit shop right in any way? Did it affect shop right in any way? Well, the left-hand turn would have reduced traffic. Shop right's contention is two miles away. Correct, and shop right took the position it had standing to make that objection on the basis of the underlying statutory authority governing standing. People can object who travel that road, but shop right, which is two miles away, what do you care? That's a hypothetical question that I can only answer with hypothetical facts. There are plenty of reasons to care. There are employees who use the roads to get to shop right. There are transportation companies. Shop right also owns, in part, transportation companies. These are your employees that would use the roads not to get to shop right, but to get to swagments. Potentially they'd be using the road to get to shop right, Your Honor. Maybe they found swagments not so good, but I'm not comprehending why any employee of shop right would care about whether there's a left-hand turn two miles away for somebody to get into a swagments. Again, Your Honor, I'm responding to a hypothetical question with hypothetical facts. The basis for all of shop right's objections were laid out in detail before the governing bodies at the state court level. No one's been hiding anything. As I pointed out, one of the interests that were laid out, certainly in the prerogative reaction, was an interest that it would affect the value of this property because of the added competition. No one's hiding from that fact. No one's playing games with it. It's out there. But the question is, from our view, before we even get to North Pennington, is does a plaintiff like this, not swagments, swagments isn't here, the alleged direct target of the anti-competitive activity, which is swagments, is not a party here. Someone who's in the business of being a landlord to supermarkets is the party. Does that party have standing? We don't get to a North Pennington analysis until we determine whether there's even standing here. And there isn't standing. And there's a very clear, long line of cases there. You can get to Wegmans by getting through Handover. The realty, Handover 30- 3201. There's no indication on this record, Your Honor, that Wegmans isn't coming. There's no indication on this record that Wegmans has walked away from the project or will walk away from the project. There's an argument- Mr. Taylor just said they're still there. They're still interested. Correct. And I think there's an argument that the matter is still being developed, the project. So there's a fairly good argument that this entire proceeding is really premature to begin with, on top of the lack of standing. There have been circuit courts that have determined, South Haven in particular, that a landlord complaining about loss of rents because of anti-competitive competition in the grocery market don't have standing. That's not what the antitrust laws were designed to protect. It's readily conceded. The plaintiff is not a consumer. The plaintiff is not a competitor. The plaintiff simply doesn't have standing. And certainly under McCready and certainly under the carpet group case, there's no- this isn't a case where you have someone who's actively participating in the relevant market who's complaining that they're- Well, I mean, in effect, the argument is it's the next case post-McCready, if you will. Is there an inextricable involvement of a developer in the purported antitrust efforts of Village to stop the development of a Wegmans? And the answer is no, because in this case, a developer is nothing more than a supplier. The developer is doing nothing more than supplying, for example- They're charged with obtaining all the necessary permits for Wegmans to construct a store on their property. Pursuant to their contract with Wegmans, they bargained for- Wegmans bargained that the developer would undertake the expense and obligation of obtaining permits and approvals. That's fairly common in the real estate industry. The damages here, again, are limited to the devaluation of the property, not an injury to competition. No one's saying output was decreased or that prices went up. The damages are purely commercial. I imagine there was quite a significant cost in signing off the various challenges to the permit application. I believe that they were in a footnote in the reply brief at $100,000 approximately. I see my time has expired. Thank you very much. Thank you. I'll give Mr. Lindsey back. Mr. Lindsey, if you'll start with- Yes. The Sixth Circuit case in South Haven is at least somewhat helpful to your opponent's side in terms of antitrust standing. How do you distinguish that case? Well, that was distinguishable because the landlord and the defendant had an existing lease deal, and they had negotiated basically a release from the lease that the defendant backed out on. But during the whole time that the dispute was ongoing, they kept paying the rent, so that essentially the landlord was still getting mostly the benefit of the bargain, and the landlord's claimed damages were the diminished value of the property because there wasn't- But the court held that South Haven, which was the landlord, is not a consumer, a customer, a competitor, or a participant in the relevant market. Correct. But it also seemed to be important to the Sixth Circuit that there was an alternative remedy against the supermarket chain, which was a breach of contract claim because they had backed out of the agreement to give up the lease. The Supreme Court said in the case here, the pre-I guess they call it the pre-case, that the sham exception to the Noor-Pennington defense had two elements. One was that the defendant's legal action was, and I quote, objectionably baseless in the sense that no reasonable litigant could realistically expect success on the merits. That's number one. Yes. Okay, now, that test is in no sense dependent upon the defendant's motives or good faith because no matter how evil or corrupt we could characterize their motives, they might still think that they might succeed on the merits. And even if they're bringing the suit not because of any public interest, but because of a competitor. But then you have to show that. And then if they show that, then you have to also show that they're trying to interfere directly with the business relationships of a competitor through the process. Now that, of course, now we get involved in the motives. But can we say here that the suits, all these things were baseless when they did have some success? No. Maybe Judge Ambrose says, well, what do they care about the bats? That may be true. But if they did something and the bats got this examination, then they may have had success on it. Well, I think first of all that depends on how you define success and how you want to divide up the different challenges or whatever. But ultimately they were unsuccessful. No, if they said you didn't give proper notice, and therefore you have to go back and we're objecting because the notice isn't proper, and the agency agrees it wasn't proper, give more notice, then they were successful. Now maybe the ultimate outcome of the procedure was not successful, but the objection was successful. Well, the agency didn't rule, for example, on the notice, the agency didn't rule that the notice was improper or the client, 3201 Realty, got this objection and said, okay, fine. The purpose of the objection was so that notice would be given, and as a result of the objection it was given. If that was the end of their objection, maybe there might be something to an argument that it was meritorious. But they kept on raising a whole bunch of other objections and are still raising objections to the same permit. It's raising whatever comes to their mind. They lose on one thing, they come up with something different. That doesn't make it any more meritorious  Okay. Thank you very much. Thank you to both counsel. And we'll take the matter under advisement and recess. Thank you.